UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMMY A. RENTZ,

        Plaintiff,

v.

WILLIAM BEAUMONT HOSPITAL,

        Defendant.

_____/

Case No. 15-11931

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [15]**

This employment dispute comes before the Court on Defendant William Beaumont
Hospital's motion for summary judgment (dkt. 15).  Plaintiff Tammy Rentz's claims arise
from her separation from William Beaumont Hospital on April 28, 2014. (Compl. ¶ 13.)
Plaintiff brings claims pursuant to the Family and Medical Leave Act (FMLA) 29 U.S.C.
§2601, *et seq.* (Count I), the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et
seq.* (Count II), and the State of Michigan's Persons With Disabilities Civil Rights Act
(PWDCRA), Mich. Comp. L. § 37.1101, *et seq.* (Count III). (Compl.) For the reasons stated
below, Defendant's motion for summary judgment is denied.

## I.    Background and Facts

Plaintiff Tammy Rentz ("Plaintiff") is a former employee of Defendant William
Beaumont Hospital ("Defendant" or "Beaumont"), where she began working as a clinical
clerk II in May 2008. (Rentz Dep. 32:23-25, Pl.'s Resp. Ex. 1, dkt. 18-2.) She worked for
Beaumont until April 28, 2014. (Compl. ¶ 13.)

Plaintiff requested, was approved for, and took FMLA leave in January 2012 for a medical procedure. (Heard Dep. 35-37, Pl.'s Resp. Ex. 6, dkt. 18-7.) Plaintiff was cleared to return to work on February 27, 2012. (Return to Work Clearance, Def.'s Mot. Summ. J. Ex. 2, dkt. 15-3.)

The parties agree that Plaintiff took FMLA leave starting February 28, 2013, following a diagnosis of breast cancer; Plaintiff alleges the leave was through March 5, 2013, and Defendant relies on a Return To Work Clearance indicating that Plaintiff was cleared to return to work on May 6, 2013. (FMLA Med. Request and Cert. Form, Pl.'s Resp. Ex. 10, dkt. 18-11; Def.'s Mot. Summ. J. Ex. 10, dkt. 18-11.) Following this leave, Plaintiff returned to work full-time with a modified work schedule consistent with her doctor's orders. (Return to Work Clearance, *Id.*)

Following the February 2013 FMLA leave, in June 2013, Keisha Heard, Plaintiff's supervisor, inquired with Human Resources/Benefits as to whether Plaintiff had exceeded her FMLA time. Ebbonye Graham, senior human resources representative in corporate human services, informed Heard via email that, "According to Benefit records, Tammy has adequate FMLA to cover her leave. Please confirm you records in e-time and ensure that FMLA days are designated appropriately." (Graham Email, June 11, 2013, Pl.'s Resp. Ex. 11, dkt. 18-12.)

Heard responded with the following:

Ms. Rentz went on a FMLA on 2/28-3/5/13, and her return date was 3/6/13. Upon Ms. Rentz's return, she has also been taking intermittence (sic) time off every Thursday and Friday. Those dates are: 5/9-5/10, 5/15-5/17, 5/23 - 5/24, 5/30 - 5/31 and 6/6 - 6/7/13. Also she left ill 2 hours early on 6/10/13 and called in ill today and will not be taking. I think Ms. Rentz is almost out of FMLA, unless I have it wrong please advise.

2

(Heard Email, June 11, 2013, Pl.'s Resp. Ex. 11, dkt. 18-12.)[1] Heard testified that the trigger for this conversation with Graham regarding Plaintiff's FMLA time was that "Ms. Rentz had -- came in and said she needed to go out for surgery, I think." (Heard Dep. 74:24-75:2, dkt. 18-7.) By June 12, 2013, Heard was informed that Plaintiff had 104 FMLA hours remaining. (Heard Dep. 80:17-19, 89:1-4, dkt. 18-7; Marion Email, June 12, 2013, Pl.'s Resp. Ex. 12, dkt. 18-13.)

Plaintiff went on FMLA leave on September 20, 2013, for a surgical procedure and post-operative healing related to the breast cancer, with an expected return to work date of October 3, 2013, and a heavy lifting restriction on return. (FMLA Med. Request and Cert. Form, Pl.'s Resp. Ex. 13, dkt. 18-14; Return to Work Clearance, Def.'s Mot. Summ. J. Ex. 4, dkt. 15-5.) On September 24, 2013, Heard send an email to Graham as follows:

> If you would be so kind as to give me a call regarding Tammy Rentz I would appreciate it. Ms. Rentz is on a FMLA again this year, I spoke with Katherine Lewis from Benefits who states that Ms. Rentz is over her 480 hours. I do not wish to hold her position from this pointe (sic) on. Please advise.

(Heard Email Sept. 24, 2013, Pl.'s Resp. Ex. 14, dkt. 18-15.)

Heard testified that she had signed a formal letter that she sent to Plaintiff, dated September 25, that indicated that Plaintiff had exhausted her leave under the FMLA and that her job protection for the position of Clinical Services Clerk I was no longer available. (Heard Dep. 106:18-107:11, dkt. 18-7.) Heard further testified that Plaintiff told her that Plaintiff had spoken with Mike Woolsey in HR, and that Plaintiff was able to return to work. (Heard Dep. 110:8-18, dkt. 18-7.)

---

[1]Plaintiff points out that Defendant has not produced documentation that she used intermittent leave time during this period, despite requests for same. (Pl.'s Resp. 3 n.2.)

In December 2013, Plaintiff requested time off from January 9-10, 2014. (Time Off Request, Pl.'s Resp. Ex. 16, dkt. 18-17.) The request was granted, noting "[o]nly if you have CTO [combined time off] time available KH [K. Heard]." [2] Plaintiff believed she had enough time to cover that time off. (Rentz Dep. 141-43, dkt. 18-2.) Plaintiff alleges that she became ill on January 8, 2014, as a result of her chemotherapy, and remained ill through January 10. (Rentz Dep. 80-81, 141-42.)

Email correspondence from Heard to Graham and Woolsey on January 15, 2014, states that "[o]n Monday, January 13, 2014 my employee Ms. Tammy Rentz came to me and asked if she could speak with me regarding her upcoming surgery. Ms. Rentz stated that she had contacted Benefits and was told that she was eligible for her FMLA benefit and that her rolling calendar year was over, so that she could have surgery in February. Ms. Rentz then stated that she wouldn't have job protection until October 2014, per Benefits." (Heard Email, Jan. 15, 2014, Pl.'s Resp. Ex. 21, dkt. 18-22.)

Plaintiff was issued a Performance Improvement Plan (PIP), prepared January 20, 2014, which stated that

> Ms. Tammy Rentz put in a request to have 1/09/2014 and 1/10/2014 off on CTO time. The request was approved and marked "only if you have CTO time available" Ms. Rentz called in on 1/8/2014, which was an unexcused absence and this did not leave her enough time to take the requested days off. Seeing that Ms. Rentz only had 17 hours of CTO time available, Ms. Rentz did not have enough CTO time to cover her request of time off on 1/10/2014.

---

[2] Plaintiff argues that Defendant's brief "confuses and combines Rentz's January 2014 illness with her February 2014 emergency hospitalization. (Pl.'s Resp. 4.) However, Plaintiff's deposition is confusing, where she was questioned about paragraph 12 of the complaint, in which she alleged being disciplined for missing work from February 2 through February 7, and she stated that she "had requested two days off of CTO time, and I was sick the day prior to my two days off. And I was written up for taking that day off." (Rentz Dep. 66:13-67:2, dkt. 15-6.)

(PIP 1/20/2014, Pl.'s Resp. Ex. 22, dkt. 18-23.)  Heard testified that this was the first time Plaintiff exceeded her CTO. (Heard Dep. 154:10-14, dkt. 18-7.)

On January 14, 2014, Plaintiff was working at the check-out window of the medical facility when she and a patient, identified as Ms. K,  had a conflict. (Rentz Dep. 88, dkt. 18-2.) Plaintiff admits that the same patient had filed a complaint against her in March of the prior year, for which Plaintiff was not written up. (Rentz Dep. 90, dkt. 18-2.) As a result of the conflict, a PIP was prepared on January 20, 2014. (PIP Prepared 1/20/2014, Def.'s Mot. Ex. 10, dkt. 15-11.) The PIP indicated that Plaintiff had been "counseled in regard to patient interaction in March 2013." (*Id.*) The previous interaction had involved the same patient. (*See id.*) Plaintiff grieved this PIP and after an investigation, Shannon Parker, the Regional Practice Administrator in Charge of the GPPIMC, concluded that the PIP was warranted and denied Plaintiff's grievance. (Parker Dep. 53, Def.'s Mot. Ex. 11, dkt. 15-12.)

Plaintiff was absent from work from February 2-7, 2014, which she alleges was due to emergency hospitalization.[3] (Rentz Dep. 66-67, Def.'s Mot. Ex. 5, dkt. 15-6.) Plaintiff had enough CTO to cover February 3-4, yet Plaintiff admits that she did not have enough CTO to cover February 5-7, 2014. (Pl.'s Resp. 6 and Weeks Email, Feb. 19, 2014, Ex. 23, dkt. 18-24.) Plaintiff was issued a PIP related to this time-off, stating that because she "didn't have enough time to cover her on 2/5 - 2/7/2014, Ms. Rentz should have reported to work." (PIP, Feb. 18, 2014, Def.'s Mot. Ex. 6, dkt. 15-7.) The PIP noted Plaintiff's comments that

---

[3] In her brief Plaintiff states that "Heard does not deny that Rentz called her from the emergency room and the hospital," citing pages 387-89 of Heard's deposition. Yet it must be noted that at these pages in the deposition, Heard simply agrees that she had no idea that Plaintiff had been hospitalized and repeatedly indicated that she did not recall or remember if Plaintiff called her from the hospital. (Heard Dep. 387-89.)

she had been unable to control a medical emergency, was hospitalized for four days due to an infection, and had to have emergency surgery due to her breast cancer, yet the PIP included a one-day suspension. (*Id.*)

On February 25, 2014, Plaintiff attended an office meeting at which Mary Kay Blaine, another Beaumont employee, was the speaker and the topic was office security and employee safety issues. (Rentz Dep. 120, Pl.'s Resp. Ex. 1, dkt. 18-2; Beaulieu Dep. 25, dkt. 18-4.) At that meeting, Plaintiff brought up her January 20th conflict with the patient. (Rentz Dep. 121.) A fellow employee recalled that at the meeting "Tammy [Plaintiff] was concerned about our safety. People coming in and the parking lot being dark." (Beaulieu Dep. 25-26, dkt. 18-4.) Heard was also in attendance at the meeting. (Rentz Dep. 121.)

Following the meeting, Heard sent an email to Blaine inquiring whether Blaine "had a chance to write a brief description of Ms. Tammy Rentz's behavior in the meeting on 2/25/2014." (Heard Email, Mar. 4, 2014, Pl.'s Resp. Ex. 35, dkt. 18-36.) Blaine wrote a summary of what happened during the meeting and forwarded it in response to Heard's email:

> Sorry for my delay, I have been hammered with a very tricky employee issue.
>
> Let me know if this works or if I need to add anything.
>
> To whom it may concern:
> I was asked to present information on Service Excellence Department including patient satisfaction and service recovery at the Internal Medicine Center on Tuesday, February 25.
> During my presentation I was interrupted several times by their employee Tammy, requesting information about what can be done to "protect" an employee if a patient behaves inappropriately. I explained the escalation process that first we try as an employee to de-escalate the situation if that doesn't work we then notify our manager. She also questioned how we can ban patient's (sic) from a practice. I explained that it is not up to the staff to 'fire' patients but up to the physicians as it is their practice and their license.

6

On several occasions during the discussion the employee became argumentative and degrading to her manager, Keisha, stating she felt hasn't done anything. She felt threatened by patients and needed more protection from "Beaumont". I explained that several measures can and have been taken to make our employees feel safe. Tammy did not appreciate nor confirm what had been done and continued to escalate. Employee claims to not have known where the panic button was until the week prior as "no one showed" her where it was. When she persisted on what can be done about a patient and the manager not supporting her as an employee, she was redirected to Human Resources. Employee then said she had already taken the matter to them and was working with them. I feel that this was a private matter as I explained to her and that this was not the appropriate venue.

During the conversation I continued to redirect her back to the education portion of the presentation however, Tammy persisted in wanting to talk about two particular incidents in front of the entire group. All other employees were sitting in a circle however she commanded attention by sitting in the middle of her room on the edge of her chair.
I felt that Tammy was inappropriate, in her disrespectful nature towards me as the presenter as well as to her leader whom she had been working with to resolve a private matter. It was apparent that she made several of her coworkers very uncomfortable with her aggressive behaviors and conversation. This was not the appropriate forum for her discussion. She also after redirection was she (sic) unwilling to move forward.

Any ? please feel free to contact me,
Mary Kay

(Blaine Email, Mar. 4, 2014, Pl.'s Resp. Ex. 35, dkt. 18-36.) The parties' versions of the actions that followed are discussed in further detail in the analysis below. The records show that Heard prepared a PIP, with a preparation date of "2/25/2014." (PIP Prepared Feb. 25, 2014, Pl.'s Resp. Ex. 36, dkt. 18-37.) The PIP noted that "Due to unprofessional and improper behavior Ms. Rentz will be terminated." (*Id.*) The PIP was signed by Heard, Beth Weeks, Regional Practice Administrator, and Theresa Peters, Vice President Beaumont Medical Group, on April 2, 2014, and was signed by Ebbonye Graham, Senior Human Resources Representative, Corporate HR, on April 11, 2014. On April 22, 2014, Weeks sent an email to Graham, notifying her of the following: "I revised the date of the PIP Level

7

II form last week. Per our discussion at your office, you indicated that Keisha and I might be bias (sic), so you were going to present the termination." (Weeks Email, Apr. 22, 2014, Pl.'s Resp. Ex. 39, dkt. 18-40.) Plaintiff was terminated on April 28, 2014. (PIP, Pl.'s Resp. Ex. 36, dkt. 18-37.)

Plaintiff filed suit on May 29, 2015. Defendant brings its motion for summary judgment arguing that Plaintiff cannot prove that Defendant interfered with her rights under the FMLA because she never asked for, nor was denied FMLA leave. (Def.'s Mot. Summ. J. 12.) Defendant also argues that Plaintiff cannot establish a prima facie case of discrimination under the FMLA because she has no evidence of a causal connection between her exercise of rights under the FMLA and her termination. (Def.'s Mot. Summ. J. 13.) Defendant argues that Plaintiff does not have enough evidence to support her claims that Defendant violated the ADA by discriminating against her because of her alleged disability and failing to provide her with reasonable accommodation. (Def.'s Mot. Summ. J. 16.)

## II.   Summary Judgment Standard

Summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (quotations omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sierra Brokerage Servs., Inc.,* 712 F.3d at 327 (citation omitted). Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

8

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III. Analysis

### A. Whether Plaintiff Can Prevail On Her FMLA Interference and Retaliation Claims

#### 1. Interference Claim

The FMLA provides a private right of action to employees to protect their rights to such leave under two different theories:  (1) the interference or entitlement theory, and (2) the retaliation or discrimination theory. *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004) (citing 29 U.S.C. § 2615(a)(1) and (a)(2)). To prevail on the interference or entitlement claim, Plaintiff must "prove that: (1) she was an eligible employee," (2) Defendant "was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006).

The parties do not dispute that Plaintiff was an eligible employee or that Defendant was an employer as defined in the FMLA. Defendant argues that Plaintiff cannot prove an interference claim because she never asked for, nor was denied leave. (Def.'s Mot. Summ. J. 12.) Plaintiff testified as follows:

9

> Q: Has anyone at Beaumont ever told you that you could not take a second FMLA leave?
> A: Well, they explained to me how it would work and when it would be available again.
> Q: Right. Did they ever deny you an FMLA leave?
> [Pl.'s attorney objection and Def.'s attorney response] . . .
> Q: I'm asking you did anyone at Beaumont ever tell you that you couldn't have an FMLA leave?
> A: No, because I never requested one.
> Q: Okay.
> A: I never requested one, so why would somebody tell me I couldn't have it. I never requested it at that point.

(Rentz Dep. 65, dkt. 18-2.)

Despite Plaintiff's testimony that she did not request FMLA leave, the Sixth Circuit has noted that where the "Plaintiff did not expressly request leave, 'the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" *Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 933 (E.D. Mich. 2005) (citing *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 723-24 (6th Cir. 2003) (*superceded on other grounds by* 29 C.F.R. 825.301(d)).

The sixth circuit has explained that "an employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA . . . has occurred." *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014) (citing *Cavin*, 346 F.3d at 723-24).

By January 15, 2014, Heard knew of Plaintiff's need for FMLA leave for an upcoming surgery as evidenced by Heard's email to Woolsey and Weeks of the same date:

> On Monday, January 13, 2014 my employee Ms. Tammy Rentz came to me and asked if she could speak with me regarding her up coming (sic) surgery.

> Ms. Rentz stated that she had contacted Benefits and was told that she was eligible for her FMLA benefit and that her rolling calendar year was over, so that she could have surgery in February. Ms. Rentz then stated that she wouldn't have job protection until October 2014, per Benefits.

(Heard Email Jan. 15, 2014, Pl.'s Resp. Ex. 21, dkt. 18-22.)

Given this evidence, a reasonable juror could conclude that Plaintiff had provided enough information for the Defendant to conclude that she would be using her FMLA benefit. Defendant did not argue the remaining factors for the interference claim. As set forth below with respect to the retaliation claim, Plaintiff was ultimately terminated from employment and denied the FMLA benefit. The Court will deny Defendant's motion for summary judgment on Plaintiff's interference claim.

### 2. Retaliation

To make out a prima facie case of FMLA retaliation under the indirect method, an FMLA plaintiff must establish that:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citations omitted). Unlike analysis of FMLA claims under the interference theory, "[u]nder the retaliation theory (also known as the discrimination theory), . . . the employer's motive *is* an integral part of the analysis." *Edgar*, 443 F.3d at 508. This is "because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.* As set forth above, with respect to the first two factors, Plaintiff provided evidence from which a jury could find that she was engaged in an activity protected by the

11

FMLA and that the employer knew she was exercising her rights under the FMLA. The parties do not appear to dispute that Plaintiff suffered an adverse employment action- she was ultimately terminated, in addition to having received multiple PIPs.

Defendant argues that there is no evidence of a causal connection between Plaintiff's termination of employment and her FMLA leave because it was the Just Culture committee that made that final recommendation for termination and the Just Culture committee did not have information about Plaintiff's history of FMLA leave. (Def.'s Mot. Summ. J. 14.) *See Donald,* 667 F.3d at 761; *Smith v. ACO, Inc.*, 368 F. Supp. 2d 721, 732 (E.D. Mich. 2005) ("The 'causal link' between the protected activity [taking FMLA leave] and adverse employment action is demonstrated by showing that the employer would not have taken the adverse action 'but for' the employee's protected activity." Citations omitted.).

The Sixth Circuit has held that "'the nearness in time' between the plaintiff's exercise of FMLA rights and his termination – [for example] three weeks in *Seeger*– 'suffices . . . to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge.'" *White v. Telcom Credit Union*, 874 F. Supp. 2d 690, 707 (E.D. Mich. 2012) (Edmunds, J.) (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012)). Plaintiff identifies the adverse employment actions as the decrease in her reliability score on employee assessments[4], Heard's attempt to post Plaintiff's job position following the 2013 FMLA leave, and the proximity of the multiple PIPs to Plaintiff's use of FMLA

---

[4]The employees undergo annual employee appraisals. Plaintiff argues that scores on her annual employee appraisals dropped after she used FMLA leave. In 2010, Plaintiff's reliability score was 3.0, in 2011 it was 4.0 and in 2012 it was 2.0. (Pl.'s Resp. Exs. 7, 8, 9, dkt. 18-8, 18-9, 18-10.)

leave and/or notification of same, and finally, the termination of Plaintiff's employment in April 2014.

It is not a stretch to suggest that a fact finder could determine that evidence shows that when Plaintiff used leave time or suggested using leave time, Heard aimed for her, as evidenced, for example, by Heard's repeated requests to HR regarding whether Plaintiff had sufficient CTO and/or FMLA leave to cover absences, despite being assured by HR that Plaintiff had sufficient time. (Heard and Graham emails June 11, 2013, Pl.'s Resp. Ex. 11, dkt. 18-12.)] In January 2014, within days of Heard being notified of Plaintiff's upcoming surgery, Heard prepared the first PIP for Plaintiff, for an unexcused absence. (Heard email Jan. 15, 2014, Pl.'s Resp. Ex. 21, dkt. 18-22.). Three others followed in short order, culminating in her termination on April 28, 2014. (PIP Prepared 2/25/14, Def.'s Mot. Summ. J. Ex. 18, dkt. 15-19.) Here, Plaintiff provides evidence of "causality by a preponderance of the evidence through close temporal proximity that is suggestive of retaliation." *Seeger*, 681 F.3d at 284. Plaintiff has shown evidence by which a jury could find a causal connection between the adverse employment actions and Plaintiff's use of FMLA benefits.

Because Plaintiff has shown evidence to support a *prima facie* case of FMLA retaliation/discrimination, the Court next applies the familiar *McDonnell Douglas* burden-shifting test. *Edgar*, 443 F.3d at 508 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The burden shifts to the employer who must then proffer a legitimate, non-discriminatory reason for its adverse employment action. *Edgar*, 443 F.3d at 508. It is not disputed that Defendant articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment: her conduct during the employee meeting with Blaine in February 2014, after which a PIP was prepared.

13

The burden then shifts back to Plaintiff to present "adequate evidence demonstrating that [Defendant's] proffered reason was a pretext for discrimination." *Seeger*, 681 F.3d at 285. "[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Id.* (citations omitted). And, although temporal proximity may meet the lower burden to establish Plaintiff's *prima facie* case, it cannot be "the sole basis for finding pretext." The Sixth Circuit, in a discrimination case under the Rehabilitation Act, has held that to satisfy the pretext burden, a plaintiff must show "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) (emphasis omitted)). The "court has typically grouped the first and third tests together because they are both 'direct attacks on the credibility of the employer's proffered motivation for firing [the employee] and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Jones*, 488 F.3d at 406 (citing *Manzer*, 29 F.3d at 1084.).

The Sixth Circuit has held that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.' " *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 401 (6th Cir. 2009)). The "key inquiry ... is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Id.* (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007)). "The employer certainly must point to particularized facts upon

14

which it reasonably relied. But 'we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.'" *Id.* (citations omitted).

In *McNeely v. Kroger*, this district considered the "paucity of 'particularized facts' upon which the defendant based its decision, calling into question its honest belief in its stated reason(s) for termination," noting there was "no evidence on whether [defendant employer] even investigated the plaintiff's claim that she had been given permission by department supervisors in the past to take FMLA leave," and "no evidence or documentation of either [investigators'] procedures or any details of their investigations." *McNeely v. Kroger*, 2014 WL 3529420 at *6 (E.D. Mich. July 16, 2014).

Plaintiff argues that Defendant's "honest belief" that Plaintiff's disciplines were warranted is belied by the following: The lack of records substantiating Heard's alleged belief that Plaintiff had previously overused her FMLA time and the lack of records substantiating assertions that Defendant investigated accusations of misconduct by Plaintiff. As just one example, Mr. Woolsey testified that the investigation prior to Plaintiff's termination "should include a discussion with the employee. Typically that discussion happens between the manager and the employee as part of the fact finding." (Woolsey Dep. 17-18, Pl.'s Resp. Ex. 33, dkt. 18-34.) Mr. Woolsey went on to testify as follows:

> Q: When you say the investigation, what is it that you expect to take place?
> A: Just what I described. If there's a complaint brought forward, that the responsible manager or somebody within the chain of command of that employee brings the complaint or the concern to the attention of the employee. That the employee is given the opportunity to respond to that concern."
> Q: Okay.
> A: And, similarly, if there are witnesses to the event, that those individuals are also spoken to to try to paint a complete picture of what had occurred."
> Q: Okay. Should there be some sort of documentation of the investigation?
> A: I would expect that there would be documentation.

15

Q: Okay. And so if an investigation did not take place, would that violate some sort of protocol or expectation that you have of practice managers prior to termination.

A: It would – Yes, it would violate my expectation of what should occur before termination.

(*Id.*)

Further, Graham testified that the PIP prepared on February 25, 2014, was based on a complaint drafted by Blaine; yet Graham testified that at the time of the original draft PIP, she did not see the complaint Blaine drafted. Graham agreed that her understanding was that Blaine drafted a complaint and Heard put together a PIP. The "date prepared" on the PIP is February 25, 2014; both parties agree the date Blaine's email summary was sent to Heard was March 5, 2014. (Graham Dep. 97-99, Pl.'s Resp. Ex. 5, dkt. 18-6; Def.'s Mot. Summ. J. Ex. 14, dkt. 15-15.) Graham also testified that she did not discuss what happened at the presentation with any employees who were actually at the presentation and did not recall discussing the event with Plaintiff after she received a written statement from Plaintiff regarding the event. (Graham Dep. 102-03.) Graham also insisted that the termination was based solely on the incident at the presentation with Blaine, yet under "Employee background information," the PIP refers to both the March 2013 counseling in regards to patient interaction, and the January 20, 2014 PIP Level I for "unprofessional communication and behavior towards a patient," further noting that "[b]oth incidents related to unprofessional behavior on the part of Ms. Rentz." (Graham Dep. 104-05, Pl.'s Resp. Ex. 5, dkt. 18-6; PIP Prepared 2/25/14, Def.'s Mot. Summ. J. Ex. 18, dkt. 15-19.)[5]

---

[5]In its Reply, Defendant cites additional evidence to show both that the cat's paw theory is not applicable and to otherwise explain the series of events surrounding Plaintiff's termination, yet such evidence is relevant in weighing the facts- it does not negate Plaintiff's showing that there exist questions of fact on each of these issues.

The Court agrees that the lack of evidence as a basis for the investigation and termination, as well as the chronology of documentation of the event and the creation of the PIP, "creates a factual dispute whether the decision to terminate was reasonably informed and worthy of credence." *White v. Telcom Credit Union*, 874 F. Supp. 2d at 710. The Court need not reach Plaintiff's other challenge, that Plaintiff behaved appropriately during both events: the confrontation with Ms. K, and Blaine's presentation. (Pl.'s Resp. 12.)

Finally, Plaintiff argues that the "Just Culture" committee, which made the final recommendation that Plaintiff's employment be terminated, was simply Heard's cat's paw in the action. (Pl.'s Resp. 16.) In discussing the "cat's paw" theory of liability, the Supreme Court has held that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *White v. Telcom Credit Union*, 874 F. Supp. 2d at 712 (citing *Staub v. Proctor Hospital*, 462 U.S. 411, 422 (2011)).  Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has provided evidence from which a reasonable jury may infer that Heard was involved in the decision to terminate her and that decision was motivated by discriminatory or retaliatory animus. For example, Heard prepared the PIP that ultimately recommended termination, the date of the preparation of the PIP pre-dates that of the email from Blaine describing the event that should have been the precursor to the final PIP, and Blaine's summary email contains language from which a finder of fact could conclude that it was written at Heard's request. Plaintiff provides evidence that the Just Culture committee's recommendation was based at least in part on information from Heard.

17

For these reasons the Court will deny Defendant's motion for summary judgment on the FMLA claims.

### B. ADA/PWDCRA Violations

#### 1. Discrimination

Plaintiff must make a *prima facie* case of disability discrimination under the indirect method (based on indirect evidence of discrimination) by showing that:

> (1) [H]e or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Ferrari v. Ford Motor* Co., No. 15-1479, 2016 WL 3443646, -- F.3d -- (6th Cir. June 23, 2016) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). The fifth factor "may also be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Jones*, 488 F.3d at 404 (quoting *Talley v. Bravor Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)). "Once the plaintiff establishes a *prima facie* case under the indirect method, the burden shifts to the defendant to 'offer a legitimate explanation for its action.'" *Ferrari*, at 7 (citing *Monette*, 90 F.3d at 1186). "If the defendant does so, the burden then shifts back to the plaintiff, who 'must introduce evidence showing that the proffered explanation is pretextual.'" *Id.* (citing *Monette*, 90 F.3d at 1186).[6]

---

[6] With respect to Plaintiff's state law claim under the PWDCRA, "[t]he PWDCRA 'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'" *Donald*, 667 F.3d at 764 (citing *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)(abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)). Neither party argues that the claims should be treated separately, and in fact, Plaintiff

For purposes of the motion for summary judgment, Defendant does not argue these criteria or challenge Plaintiff's ability to establish a *prima facie* case, but only argues that Plaintiff's disability discrimination claim must fail for the same reasons as the FMLA claim fails- it was Plaintiff's conduct and not her alleged disability that caused Beaumont to terminate her employment.[7] (Def.'s Mot. Summ. J. 19.)The Court relies on its analysis above with regard to pretext and Plaintiff's termination. For these reasons, the Court finds that Plaintiff has raised material issues of fact as to whether Defendant's reason for terminating Plaintiff and taking other adverse actions are legitimate or pretext.

### 2.   Accommodation

Plaintiff claims that Defendant failed to provide her with reasonable accommodations, as required under the ADA. Defendant acknowledges that it has an obligation to provide reasonable accommodation to an employee's disability. *See* 42 U.S.C. § 12112; *EEOC v.*

---

addresses them together. (Pl.'s Resp. 22-23; Def.'s Mot. Summ. J. 17 n.2)

[7]With respect to the fifth criteria, Heard testified that in the time she had been supervising Plaintiff, from 2009 forward, two other employees had gone over their CTO time and she had not placed them on a PIP, nor were they given written counseling. (Heard Dep. 264-67, Pl.'s Resp. Ex. 6, dkt. 18-7). Heard provided no explanation for exercising her discretion in this matter to place Plaintiff on a PIP other than that she "followed the policy and sent it to human resource (sic)." (*Id.* at 266:17-267:6.) It is also worth noting that Plaintiff argues that Heard had managerial discretion to excuse Plaintiff's medically necessary absences, and that Defendant's Reliability Policy states that "managers are encouraged to use counseling sessions as a preliminary step to improve employee reliability." (Pl.'s Resp. 8.) Yet Plaintiff's citation to an excerpt from Defendant's document should be read in whole: "While managers are encouraged to use counseling sessions as a preliminary step to improve employee reliability, it is not required prior to placing an employee in a formal action for violating reliability standards." (Beaumont Reliability Program 02/01/14, Pl.'s Resp. Ex. 26, dkt. 18-27.)  Plaintiff also argues that she was never given coaching for her behavior. (Pl.'s Resp. 8.)

*Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015); M.C.L. § 37.1102. Yet Defendant shows

that Plaintiff testified as follows:

> Q: . . . did you ever request an accommodation in writing for your alleged
> handicap?
> A: Yeah . . . when we filled out the family medical leave papers there was [sic]
> a few things on there the doctors requested.
> Q: And were those accommodated?
> A: Yes.

(Rentz Dep. 129, Def.'s Mot. Summ. J. Ex. 5, dkt. 15-6.) Defendant argues that Plaintiff's

admission that Beaumont gave her every accommodation that she sought bars her claims

for failure to accommodate.

However, Plaintiff relies on the unexpected time off that Plaintiff required, which was

not covered by FMLA or her CTO balance, the "unplanned medical emergencies" in

January and February 2014, for which Plaintiff was disciplined. (Pl.'s Resp. 23-24.) The

Sixth Circuit has recognized that "a medical leave of absence can constitute a reasonable

accommodation under appropriate circumstances." *Walsh v. United Parcel Service*, 201

F.3d 718, 726 (6th Cir. 2000) (citing *Cehrs v. Northeast Ohio Alzheimer's Research Center*,

155 F.3d 775 (6th Cir. 1998)).

> The burden of establishing that the proposed accommodation is reasonable
> remains with the plaintiff, regardless of whether plaintiff has direct or indirect
> evidence in support of his or her ADA claim. This logically flows from the fact
> that the plaintiff is always required to show that he or she is qualified for the
> position, with or without reasonable accommodation. See 42 U.S.C. §
> 12112(b)(5)(A).

*Walsh*, 201 F.3d at 725-26 (internal citations omitted).

Plaintiff has shown evidence to raise a genuine issue of material fact as to whether

one or both of these absences would have been a reasonable accommodation under the

ADA. With respect to the January 2014 absence, Defendant argues that Plaintiff did not

20

provide any documentation from a healthcare provider to support her allegation that the extra day she missed was the result of a medical issue related to her breast cancer. (Rentz Dep. 80-81, Def.'s Mot. Summ. J. Ex. 5, dkt. 19-6.) Similarly, Defendant argues that Plaintiff did not submit documentation from her healthcare provider in support of the February 2014 absence. Yet Plaintiff has raised genuine issues of material fact as to whether Defendant had notice that Plaintiff was hospitalized at that time, including that Heard did not recall or remember if Plaintiff called her from the hospital. (Heard Dep. 387-89.) Plaintiff shows evidence that other employees were aware of her hospitalization. (Beaulieu Dep. 24, Pl.'s Resp. Ex. 3, agreeing that she was aware that Rentz was out of work due to an infection because other employees told her, dkt. 18-4; Diggs Dep. 22, Pl.'s Resp. Ex. 4, recalling a conversation "when she was to return to work" but cannot recall whether it was at a point in time when Rentz was in the hospital, dkt. 18-5.)

For these reasons the Court will deny Defendant's motion for summary judgment as to the ADA claims.

## IV.   CONCLUSION

For the reasons set forth above, the Court DENIES Defendant's motion for summary judgment (dkt. 15).

SO ORDERED.

s/Nancy G. Edmunds_____

Nancy G. Edmunds
United States District Judge

Dated:  July 14, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 14, 2016, by electronic and/or ordinary mail.

s/Carol J. Bethel_____
Case Manager